## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

BRAIN & SPINE SURGEONS OF NEW
YORK, P.C., a New York professional
corporation,

      Plaintiff,

v.

TRIPLE–S SALUD INC., d/b/a "BLUE
CROSS BLUE SHIELD OF PUERTO
RICO," a foreign corporation,

      Defendant.

Case No. _____

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, BRAIN & SPINE SURGEONS OF NEW YORK, P.C. ("Plaintiff"), through

undersigned counsel, sues Defendant, TRIPLE–S SALUD INCORPORATED, d/b/a BLUE

CROSS BLUE SHIELD OF PUERTO RICO ("Defendant"), and alleges as follows:

### INTRODUCTION

1.      This action concerns Defendant's refusal to pay Plaintiff amounts owed for

medically necessary services that Plaintiff provided to a patient, I.F. ("Patient"), who was at all

times material a subscriber covered under an individual health insurance policy insured, operated,

and/or administered by Defendant that provided coverage for medical services provided to Patient

in the State of New York (the "Policy").

2.      For the claims at issue in this action, Plaintiff was a non-participating provider with

Defendant and, as a result, did not agree to be bound by Defendant's reimbursement policies or

rate schedules. Nevertheless, Defendant has not paid Plaintiff the fair market or reasonable value

of the medical services provided.

3.      Plaintiff provided medically necessary services and care to Patient at the Westchester Medical Center ("WMC") for multiple traumatic injuries Patient sustained during a motorcycle accident that occurred in Westchester County, New York, including a severe C2 cervical spinal fracture, severe spinal cord compression, central cord syndrome, and other related injuries and complications. Due to the severity of Patient's injuries, a two-stage cervical spine surgical procedure was required, which Plaintiff performed on Patient on an urgent or emergency basis and/or as a continuation of care stemming from Patient's initial treatment.

4.      Plaintiff performed the staged procedures (the "Surgeries") with the understanding and expectation that Defendant would reimburse Plaintiff at rates equal to the fair market or reasonable value of Plaintiff's services, in accordance with industry custom. However, Defendant unjustly enriched itself by paying Plaintiff far less than the reasonable value of the medical care provided while retaining the benefits obtained as a result thereof. Accordingly, Plaintiff seeks reimbursement at rates representing the reasonable fair market value of such services.

## PARTIES

5.      At all times material, Plaintiff is and was a New York domestic professional service corporation with its principal place of business located in Westchester County, New York.

6.      At all times material, Defendant is and was a foreign for-profit corporation with its principal place of business located in San Juan, Puerto Rico, conducting business as "Blue Cross Blue Shield of Puerto Rico."

## JURISDICTION AND VENUE

7.      This Court possesses original jurisdiction pursuant to 28 U.S.C. § 1332, as the parties are diverse and the amount in controversy exceeds $75,000, exclusive of attorney's fees, costs, and interest.

[9600.001/5424814/3]

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

9.     At all times material, Defendant engaged in substantial and not isolated activity in the State of New York.

10.     Upon information and belief, Defendant systematically contracts to provide health insurance to individuals that it knows, or should have known, are New York citizens and residents (like and including Patient, who upon information and belief, was at all times material a resident of Westchester County, New York).

11.     Consequently, Defendant is (i) in the business of providing managed healthcare products, health insurance, and associated administrative services to individuals who frequently seek medical services and care in New York from medical providers licensed by the State of New York (like and including Plaintiff), and (ii) responsible for paying for medical services provided to Patient and Defendant's other Policy subscribers.

12.     Defendant also systematically contracts to provide utilization and management services that permit its subscribers to obtain medical services and care in New York from medical providers licensed by the state of New York, as contemplated by Patient's health insurance policy, and so is subject to New York law, regulation, and oversight governing Defendants' conduct.

13.     Defendant frequently and systematically administers and provides health insurance and related services in New York via its New York agent, Empire Blue Cross Blue Shield ("Empire Blue").

14.     Upon information and belief, Defendant manifested assent and/or consented to Empire Blue acting on its behalf and subject to Defendant's direction and control with respect to the claims at issue. Alternatively, if Defendant did not explicitly or impliedly assent to such agency,

Plaintiff reasonably believed that Empire Blue had authority to act as Defendant's duly authorized agent based on the conduct of both Defendant and Empire Blue.

15.     As such, Empire Blue was, at all times material, Defendant's duly authorized agent responsible for administering and/or paying the claims at issue on Defendant's behalf.

16.     By administering the claims at issue pursuant to the BlueCard Program, Empire Blue acted within the scope of its actual or apparent authority as Defendant's agent with respect to the Claims at issue, and Empire Blue's contacts with New York are imputed to Defendant.

17.     Accordingly, at all times material, Defendant purposefully availed itself of benefits in the State of New York by: (i) utilizing Empire Blue as its agent for purposes of administering the claims at issue for services that were provided as part of the Surgeries in New York, (ii) accessing Empire Blue's rates for the geographic location in New York where such services were provided, and (iii) systematically contracting to provide health insurance and utilization and management services relating to individuals who frequently seek medical services and care from medical providers licensed by the state of New York (like and including Patient).

## GENERAL ALLEGATIONS

18.     Plaintiff, through its physicians, provides medical services to patients in Westchester County, New York, including patients admitted into WMC for spinal injuries.

19.     Plaintiff's physicians are licensed medical doctors practicing in the State of New York, including Westchester County, New York.

20.     Plaintiff's physicians are fellowship trained and board-certified neurosurgeons who perform spinal surgeries, brain surgeries, and other surgical procedures, using advanced technology and world-class expertise, that allow for complex repair of spinal, brain, and other neurological tissue after trauma, cancer, and/or congenital defects.

21.     At all times material, Defendant was authorized to and engaged in the business of selling insurance, administering insurance, and/or paying insurance claims throughout the State of New York, including Westchester County, New York.

22.     At all times material, Defendant did, in fact, provide insurance coverage for healthcare services provided to persons covered under one of its managed healthcare products in the State of New York (like and including Patient).

23.     Upon information and belief, at all times material, Defendant collected premiums and other forms of compensation from Patient and other Policy subscribers in return for agreeing to properly reimburse providers (like and including Plaintiff) that render medical services to Patient and Defendant's other Policy subscribers.

24.     In exchange for premiums, fees and/or other forms of compensation, Defendant agrees to administer claims and provide reimbursement for healthcare services rendered by providers (like and including Plaintiff) to persons covered under one of its health insurance policies (like and including Patient).

25.     At all times material, Patient was covered under the Policy, which provided coverage for medical services received by and/or otherwise provided to Patient in New York.

26.     Upon information and belief, at all times material, Defendant charged higher premiums for products that provide coverage for "out-of-network" services than it charged for products that do not provide coverage for "out-of-network" services. Enrollees in Defendant's products that provide coverage for "out-of-network" services may seek treatment from providers that do not participate in Defendant's networks, at rates that are higher than the discounted rates Defendant forces upon its "in-network" providers.

27.     Upon information and belief, at all times material, Patient was a resident of the state of New York.

28.     Upon information and belief, WMC was and is all times material "in-network" with Defendant.

29.     At all times material, Plaintiff was not a participating "in-network" provider within Defendant's provider network.

30.     Plaintiff does not seek to enforce any rights under the Policy.

**A.  Relevant Medical History, Evaluation, and the Emergency Surgeries.**

31.     On or about August 18, 2016, Patient was transported to WMC in Valhalla, Westchester County, New York, where Patient presented to the WMC emergency department with multiple traumatic injuries sustained in an accident in which Patient was riding a motorcycle and struck an automobile.

32.     Plaintiff's physicians and/or other physicians at WMC determined that Patient suffered from an urgent or emergency medical condition, including a cervical fracture at level C2, severe spinal cord compression from multilevel cervical stenosis with signal change and ventral compression, and other related conditions; and (ii) immediate surgical intervention was required to treat Patient's cervical C2 fracture and rapidly worsening central cord syndrome.

33.     Accordingly, Patient was admitted to WMC through the emergency department for such intervention and treatment.

34.     Plaintiff's physicians were contacted as the on-call neurological specialty group at the time for care at WMC after it was determined that Patient required immediate medical attention for such severe spinal injuries; however, due to the severity of the injuries, the treatment was required to be planned and implemented as two different, staged procedures.

35.     On or about August 19, 2016, Plaintiff's physicians performed, as co-surgeons, the first stage of the procedure, which included: (i) anterior cervical corpectomy of C4 and anterior cervical diskectomy of C3-C4 and C4-C5, (ii) anterior arthrodesis of C3-C4 and C4-C5; (iii) placement of a titanium biomechanical device into vertebral body defect at C4; (iv) anterior instrumentation at C3 to C5; and (v) other related procedures.

36.     On or about August 22, 2016, Plaintiff's physicians performed the second stage of the procedure, which included (i) posterior cervical laminectomy at C3 through C7; (ii) fusion with instrumentation; and (iii) other related procedures.

## B.   **Plaintiff and Defendant Did Not Have a Written Agreement That Established an Amount That Would Be Paid for the Care Provided.**

37.     The services Plaintiff provided to Patient as part of the Surgeries in this case was provided on an "out-of-network" basis, meaning that Plaintiff and Defendant did not have a written agreement establishing a rate of payment for the care provided.

38.     Consequently, Plaintiff was dependent on Defendant to conduct business honestly and pay Plaintiff the reasonable value of the emergency care provided to Defendant's subscribers as required under New York law. *See New York City Health & Hosps. Corp. v. Wellcare of New York, Inc.*, 937 N.Y.S.2d 540 (N.Y. Sup. Ct. 2011); N.Y. Fin. Serv. Law § 605(a).

39.     Further, industry standards dictate that, in circumstances such as those at issue here, the amount Defendant should pay to Plaintiff for the Surgeries is based on "the reasonable and customary amount," also referred to as "the usual, customary, and reasonable amount, "the prevailing rate," and similar nomenclature.

40.     Given the nature of these relationships, an equitable obligation arises to account for the benefit provided by Plaintiff to Defendant, which requires that Defendant pay Plaintiff the reasonable value of the services rendered.

41.     Defendant is therefore obligated to pay Plaintiff for the reasonable value of the services provided as part of the Surgeries.

**C.  Federal and New York Laws Protecting Patients.**

42.     Receiving payment from Defendant for the reasonable value of their services was essential because, unlike other situations involving Plaintiff and other "out-of-network" providers, New York law shields Patient (and Defendant's other subscribers) from liability for Plaintiff's Claims, while both federal and state law obligate Plaintiff to treat all patients that arrive at the emergency rooms they staff.[1]

43.     For example, under the federal Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. §§ 1395dd(a)—(b), (d), and (h), hospitals and physicians who staff hospital emergency rooms have a duty to "provide for an appropriate medical screening examination" when an individual comes to the emergency department. If "the individual has an emergency medical condition," they are required to "stabilize the medical condition" without inquiry into "the individual's method of payment or insurance status." *Id.*

44.     Hospitals are subject to civil liability for a violation of EMTALA's mandates, 42 U.S.C. § 1395dd(d)(2)(A), and "any physician who is responsible for the examination, treatment,

---

[1] These statutes and regulations provide that Defendant "shall ensure that the insured shall incur no greater out-of-pocket costs for the emergency services than the insured or enrollee would have incurred with a health care provider that participates in the health care plan's provider network." N.Y. Fin. Serv. Law § 605(a)(1); *see also* N.Y. Fin. Serv. Law § 602(b)(2); N.Y. Ins. Law § 3241(c). Whenever Defendant fails to pay the Plaintiff's full charges for a given claim for emergency services, Defendant must provide its patients with notice, which explains to the patients, *inter alia,* that the patient "shall incur no greater out-of-pocket costs for the services than the insured would have incurred with a participating physician" and which "direct[s] the insured to contact the health care plan in the event that the non-participating physician bills the insured for the out-of-network service." N.Y. Comp. Codes. R. & Regs. tit. 23 § 400.5(a)(3).

or transfer of an individual in a participating hospital" who negligently violates EMTALA is subject to civil monetary penalties of up to $50,000 per violation. 42 U.S.C. § 1395dd(d)(1)(B).[2]

45.     New York law goes even further than EMTALA and imposes criminal liability on any emergency room physicians who fail to satisfy its requirements through the New York Public Health Law § 2805-b(2)(b), which provides that "[a]ny licensed medical practitioner who refuses to treat a person arriving at a general hospital to receive emergency medical treatment . . . shall be guilty of a misdemeanor and subject to a term of imprisonment not to exceed one year and a fine not to exceed one thousand dollars."

46.     These statutes and regulations ensure that Defendant's subscribers (like and including Patient) incur no liability for out-of-network emergency services greater than the subscriber's in-network co-payments, coinsurance, and deductibles, and thereby effectively remove Patient (and Defendant's other subscribers) entirely from payer-provider reimbursement disputes in New York.

47.     This structure provides Defendant with an opportunity to retain a substantial benefit because it eliminates complaints by Defendant's subscribers that often occur when Defendant directs healthcare providers to seek the balance of their bills from its subscribers, as well as incentivizing Defendant to generate "shared savings" fees by paying less than the amount that would otherwise be owed for out-of-network emergency care like that Plaintiff provided to Patient in this case.

---

[2] Emergency room doctors are often also obligated to provide emergency medical care under their contractual arrangements with the hospitals. Hospitals subject to EMTALA are permitted to contract for emergency services, provided they comply with certain regulatory requirements. 42 C.F.R. § 482.12.

48.     Therefore, Defendant's actions have effectively prevented Plaintiff from recovering the amounts owed because, as a healthcare provider, Plaintiff is prohibited by statute from requesting the additional payment from Patient.

**D.  <u>The BlueCard Program</u>.**

49.     Defendant is a licensee of the Blue Cross and Blue Shield Association ("BCBS Association") and participates in the BCBS Association's BlueCard Program, which ostensibly allows Defendant's subscribers to receive treatment throughout the United States.

50.     Empire Blue is also a licensee of the BCBS Association and participates in the BlueCard Program.

51.     As a participant of the BlueCard Program, Empire Blue is responsible for administering claims for medical services provided in New York to subscribers of health insurance policies issued by other participants of the BlueCard Program located outside of New York.

52.     As participants in the BlueCard Program, Defendant and Empire Blue enter into agreements pursuant to which Empire Blue agrees to administer and pay claims for medical services provided in New York to Defendant's subscribers, and Defendant agrees to reimburse Empire Blue for paying the claims on its behalf.

53.     According to the BCBS Association, the BlueCard Program facilitates cooperation among all licensees of the BCBS Association, allows the licensees to operate as a single national program, and provides "a single point of contact for . . . claims payment/adjustment and issue resolution."

54.     The apparent purpose of this cooperation among licensees of the BCBS Association was to address a perceived "urgent need to become a cohesive national unit to compete effectively."

55.     According to the BCBS Association, licensees "understood that continuity of purpose can only be accomplished by working together as one unit."

56.     Pursuant to the BlueCard Program, when subscribers of certain health insurance plans issued by Defendant receive medical services in New York, Empire Blue acts as Defendant's agent in administering the claims for those services in accordance with its payments arrangements with providers in the state of New York, including in-network contracts that Empire Blue has entered into with providers (on behalf of itself and other participants of the BlueCard Program), local payment rates, and/or rates required by applicable New York law.

57.     Further, Defendant accesses Empire Blue's rates for the services in the community in New York where the services are provided, including rates set forth in Empire Blue's contracts with in-network providers.

58.     The subscriber ID card that Defendant issued to Patient contained a suitcase label, which tells providers like Plaintiff that the subscriber is a part of the BlueCard Program.

59.     BCBS Association licensees (like and including Defendant) instruct New York medical providers (like and including Plaintiff) to use Empire Blue as their agent and "point of contact" for claim submission, appeals, and related questions, and to treat Defendant's subscribers (and subscribers of other out-of-state BCBS Association licensees) the same as they would a local Empire Blue subscriber.

60.     Empire Blue, on behalf of and as agent for Defendant, handles claims processing and reimbursement for claims services provided by New York medical providers in the state of New York to Defendant's subscribers (like and including Patient).

61.     The BlueCard Program effectively links the various BCBS Association licensees through a single system for claims processing and reimbursement. Under this system, New York

medical providers must submit their claims to Empire Blue, which is the agent for all pricing of claims, reimbursement rules, payments and adjustments, appeals, and other claims administration and processing functions for services provided by New York medical providers to any BCBS Association licensee subscribers (like and including Defendant).

62.    Upon information and belief, BCBS Association licensees (like and including Defendant) abuse the foregoing system as a backdoor to engage in the health insurance business with respect to patients who are citizens or residents of other states and/or territories (like and including Patient), while simultaneously attempting to avoid regulation by those other jurisdictions (like and including New York).

**E.  Defendant's Underpayment of the Claims.**

63.    Upon information and belief, no prior authorizations for the Surgeries were issued by or on behalf of Defendant.

64.    Plaintiff submitted health insurance claim forms (collectively, the "Claims") to Defendant, through its authorized agent, Empire Blue, requesting reimbursement for the medical services that Plaintiff provided to Patient through the Surgeries.

65.    All the Claims indicated that the services provided as part of the Surgeries were for emergency care by checking (or entering a "Y" for "yes" in) box 24 C on the Claims.

66.    Plaintiff's charges for the services provided through the First Surgery totaled **$310,402.00** (the "First Claim"). Defendant, individually and/or through its agent, Empire Blue, has only paid Plaintiff the total amount of **$10,644.42** for the First Claim (the "First Determination").

67.    Plaintiff's charges for the services provided through the Second Surgery totaled **$582,782.00** (the "Second Claim"). Defendant, individually and/or through its agent, Empire Blue,

has only paid Plaintiff the total amount of **$7,170.29** for the Second Claim (the "Second Determination").

68.     Specifically, after receiving the Claims, Defendant, individually and/pr through its authorized agent, Empire Blue, processed, determined allowed amounts, approved for payment, and/or made payment on the Claims, albeit at rates substantially less than the reasonable value of the emergency medical services provided by Plaintiff.

69.     Upon information and belief, pursuant to the BlueCard Program, Defendant is responsible for reimbursing Empire Blue for any payments that it made to Plaintiff for the Claims.

70.     Defendant, individually and/or through its agent, Empire Blue, issued remittance notices to Plaintiff for the Claims reflecting allowed amounts for the underlying services that were significantly below the "usual and customary provider charges for similar services in the community where the services were provided" that Defendant was obligated to pay Plaintiff pursuant to applicable law.

71.     All applicable conditions precedent to bringing this action have occurred or were performed, excused, and/or otherwise waived.

## COUNT I – UNJUST ENRICHMENT UNDER NEW YORK LAW

72.     Plaintiff re-alleges and incorporates by reference the facts set forth in paragraphs 1 through 38 and 42 through 71 above as though fully set forth herein.

73.     Under applicable New York law, Defendant is obligated to provide coverage for emergency medical services provided by out-of-network providers like and including those services Plaintiff rendered to Patient in conjunction with the Surgeries.

74.     Plaintiff conferred a direct benefit on Defendant by providing valuable medical services to Patient through the Surgeries with Defendant's knowledge and/or approval.

75. More particularly, Defendant derived a direct benefit from Plaintiff's rendering of medical services to Patient because it is through Plaintiff's rendering of those services that Defendant fulfilled its legal obligations to Patient.

76. When Plaintiff provided covered medical services to Patient, Defendant received the benefit of having its legal obligations to Patient discharged.

77. Plaintiff's rendering of covered medical services to Patient further benefitted Defendant because it offered a more permanent solution to the medical conditions for which Patient initially presented to WMC and/or those that developed after Patient's admission to WMC, thus negating Patient's need to seek additional medical treatment in the future for which Defendant would also be financially liable.

78. Defendant was aware of and implicitly approved Plaintiff's rendering of emergency medical services to Patient.

79. Defendant has failed to pay the reasonable value of the benefit conferred upon it by Plaintiff, in this case, the reasonable value of the services provided to Patient for the Claims at issue.

80. Defendant's liability as the party responsible for payment to Plaintiff for the services it provided to Patient is established by Defendant's determination that the services were covered and its payment for the services, albeit at rates far below that to which Plaintiff is entitled.

81. Plaintiff conferred a direct benefit on Defendant by providing valuable emergency medical care to Patient, for which Defendant was responsible for payment.

82. Defendant further benefited directly from its refusal to reimburse Plaintiff for the reasonable value of the medical services provided to Patient, including by paying less than what it would otherwise owe Empire Blue through the BlueCard Program.

83. Additionally, Defendant benefitted directly from Plaintiff's provision of out-of-network services to Patient, as Defendant charged a higher premium for providing coverage for such out-of-network services, without incurring the additional costs of actually paying for those out-of-network services.

84. Defendant voluntarily accepted, retained, and enjoyed, and continues to accept, retain, and enjoy, the benefits conferred upon it by Plaintiff, knowing that Plaintiff expected to be paid the fair market or reasonable value of its services.

85. Because the benefits that Defendant received were at Plaintiff's expense, equity and good conscience require restitution of said benefits to Plaintiff.

86. As a result, Defendant has withheld for itself monies that should have been paid to Plaintiff for Plaintiff's services and has received an unjustified windfall.

87. Under the circumstances, it would be unjust and inequitable for Defendant to retain the benefit it received though underpaying Plaintiff for valuable emergency medical care that Plaintiff was compelled to render.

88. Plaintiff is therefore entitled to be reimbursed, as permitted by applicable law, in an amount which will continue to accrue through the date of trial because of Defendant's continuing unjust enrichment, equal to (i) the difference between the amount Defendant adjudicated as payable for the emergency medical care Plaintiff rendered to Patient and the reasonable value of those services, plus (ii) the loss of use of that money.

WHEREFORE, Plaintiff prays that this Court enter a judgment against Defendant and in favor of Plaintiff in an amount representing the difference between the amounts Defendant paid to Plaintiff for the claims at issue and the fair market or reasonable value of the medical services

underlying those claims, as determined by the finder of fact, together with an award of all interest, costs, and such other and further relief as the Court may deem just and proper.

## COUNT II – BREACH OF IMPLIED-IN-FACT CONTRACT UNDER NEW YORK LAW

89.     Plaintiff re-alleges and incorporates by reference the facts set forth in paragraphs 1 through 37, 39 through 41, 49 through 64, and 66 through 71 above as though fully set forth herein.

90.     This Count II is plead in the alternative to all remaining counts and only to the extent that the Surgeries are determined to not be emergency services and care.

91.     As alleged above, Plaintiff has conferred a direct benefit on Defendant by: (a) rendering "out-of-network" medical services to Patient and Defendant's other members, thereby making Defendant a more attractive option to potential customers by enhancing Defendant's networks and permitting Defendant to charge a higher premium for its products that provide coverage for such "out-of-network" services, including the Policy issued to Patient; (b) ensuring that Patient (and Defendant's other members) have prompt and reasonable access to "out-of-network" medical providers like Plaintiff for which Defendant is obligated to provide coverage and pay; and/or (c) allowing Patient to avoid being subject to balance billing for the services provided as part of the Surgeries, thereby eliminating complaints by Patient that would have occurred had Plaintiff instead sought the balance of its bill from Patient

92.     Upon information and belief, Defendant: (a) approved of Patient's admission into WMC for the treatment of Patient's medical conditions; (b) approved of the provision of medical services to Patient by providers like and including Plaintiff during that admission; and (c) tacitly agreed to pay Plaintiff for the services rendered to Patient as part of the Surgeries.

93.     In exchange, Plaintiff agreed to perform the Surgeries on Patient and to not balance bill Patient for the Surgeries.

94.     While the parties did not agree on a specific price for the Surgeries, industry standards dictate that the amount to be paid in circumstances like those at issue here is "the reasonable and customary amount," also referred to as "the usual, customary, and reasonable amount," "the prevailing rate," and similar nomenclature. In the industry, it is recognized and accepted that, when determining the amount of payment under such standards, it is most commonly appropriate to refer to a schedule of charges created by FAIR Health, Inc. ("FAIR Health") to determine the amount of the payment. FAIR Health data is accepted throughout the industry as the most appropriate benchmark for determining the amount of payment under the foregoing standards. FAIR Health creates and publishes databases that show how much healthcare providers have charged for particular services in a particular geographic area during a particular time period.

95.     Defendant acknowledged its obligation and responsibility for payment and its approval of Plaintiff's performing medical services as part of the Surgeries by paying the Claims for those services and/or issuing remittance notices to Plaintiff reflecting allowed amounts for those services.

96.     Defendant therefore knew or should have known that Plaintiff was conferring the above benefits with the expectation that it would be reimbursed by Defendant for same in accordance with industry standards, i.e., at "the reasonable and customary amount," "the usual, customary, and reasonable amount," "the prevailing rate," or the like, which in the industry is generally accepted to be based on FAIR Health data.

97.     Plaintiff fully performed its obligations under the parties' implied-in-fact contract by performing the Surgeries and by not balance billing Patient for the Surgeries.

98.     As set forth above, however, Defendant materially breached the parties' agreement by failing and/or refusing to pay Plaintiff at "the reasonable and customary amount," "the usual,

customary, and reasonable amount," or "the prevailing rate" for the services that Plaintiff provided as part of the Surgeries, as the amounts Defendant paid to Plaintiff on the Claims are significantly less than what Defendant should have paid based on FAIR Health data for those services.

99.     Defendant has refused to cure and/or remedy the foregoing breach, although duly demanded.

100.     As a direct and proximate result of Defendant's breach of the parties' implied-in-fact contract (i.e., Defendant's tacit promise to pay Plaintiff in accordance with industry standards), Plaintiff has been damaged.

101.     The circumstances are such that it would be inequitable for Defendant to retain the aforementioned benefits without paying "the reasonable and customary amount," "the usual, customary, and reasonable amount," or "the prevailing rate" for same, based on FAIR Health data for the services underlying the Surgeries.

WHEREFORE, Plaintiff prays that this Court enter a judgment against Defendant and in favor of Plaintiff in an amount representing the difference between the amounts Defendant paid to Plaintiff for the claims at issue and paying "the reasonable and customary amount," "the usual, customary, and reasonable amount," or "the prevailing rate" for medical services underlying those claims, as determined by the finder of fact, together with an award of all applicable interest, costs, and such other and further relief as the Court may deem just and proper

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all issues so triable.

DATED this 20th day of October, 2022.

Respectfully submitted,

/s/ *Michael F. Fried*

Michael F. Fried, Esq.
Southern District of New York Bar Code MF1127
COHEN HOWARD, LLP
766 Shrewsbury Avenue, Suite 200
Tinton Falls, NJ 07724
Tel: (732) 747-5202
Fax: (732) 747-5259
Email: mfried@cohenhoward.com

-and-

Co-Counsel *(Pro Hac Vice Motion to be Submitted)*
Genevieve Lee Turner, Esq.
Florida Bar No. 100058
SHAPIRO, BLASI, WASSERMAN & HERMANN, P.A.
7777 Glades Road, Suite 400
Boca Raton, FL 33434
Tel: (561) 477-7800
Fax: (561) 477-7722
Email: gturner@sbwh.law
       ksandoval@sbwh.law